# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| **Dominique C. Wiggins** | \* |
| **319 Joppa Crossing Court** | \* |
| **Joppa, MD 21085** | \* |
| | \* |
| *Plaintiff,* | \* |
| | \* |
| | \*   **Case No.: 22-1089** |
| | \* |
| **v.** | \* |
| | \* |
| | \* |
| **Baltimore City, Maryland;** | \*   **JURY TRIAL DEMANDED** |
| **Baltimore Police Department** | \* |
| **242 W. 29th Street** | \* |
| **Baltimore, MD 21211** | \* |
| | \* |
| *Defendant.* | \* |
| | \* |
| **Serve:** | \* |
| | \* |
| **The Baltimore City Law Department** | \* |
| **Office of Legal Affairs** | \* |
| **C/O City Hall, Room 101** | \* |
| **100 N. Holliday St., Suite 101** | \* |
| **Baltimore, MD 21202** | \* |
| | \* |
| **Baltimore Police Headquarters** | \* |
| **601 East Fayette St.** | \* |
| **Baltimore, MD 21202** | \* |
| | \* |

## COMPLAINT FOR EQUITABLE RELIEF AND COMPENSATORY DAMAGES

COMES NOW, Plaintiff, Detective Dominique Wiggins (hereinafter "Plaintiff" or "Det. Wiggins"), by and through her undersigned counsel Dionna Maria Lewis, Esq. complains against Defendant, Baltimore City Police Department (hereinafter "Defendant" or "BPD") and in support thereof states as follows:

1

## INTRODUCTION

1. On August 10, 2016, the Department of Justice published a scathing report about the Baltimore Police Department's widespread constitutional violations, the targeting of African Americans, and a culture of retaliation. And, while the investigation and report focused largely on how Baltimore police abused the law, the people they were meant to serve, and the public trust, the complicit institutional engine that acquiesces in the destruction and demise of BPD's own Black women officers and sergeants remains pervasive, continuous, and swept under the rug. ***This case is about when the police are fearful of the police—their own brothers and sisters in blue.***

2. This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. ("Title VII"); the Civil Rights Act of 1866, Section 1983(a) ("Section 1983"), 42 U.S.C. § 1320d-6 *et seq*.; and the Maryland Fair Employment Practices Act, Md. Code § 20-601 *et seq*. (FEPA) for the Defendant's unlawful harassment, discrimination, and hostile work environment based on race (African American) and sex (female) against the Plaintiff.

## JURISDICTION AND VENUE

3. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 as it asserts a claim that arises under the Constitution, laws or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq*., and Section 1983, to redress and enjoin employment practices of the Defendant.

4. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

5. Venue is appropriate because a substantial part of the actions complained of are the result of actions and employment practices of Defendant, which operates in Baltimore, Maryland.

6. Additionally, venue is proper in the District of Maryland Court pursuant to 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendant transact substantial business in this District, and Defendant maintain employment records related to this action in the District of Maryland.

## EXHAUSTION OF REMEDIES

7. Plaintiff has exhausted all of her administrative remedies.

8. Plaintiff filed a charge with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission ("EEOC") on March 1, 2021, alleging discrimination based on race (African American), and sex (female).

9. On February 11, 2022, after Plaintiff's request through her counsel, the Equal Employment Opportunity Commission ("EEOC") issued Plaintiff a Right-to-Sue Letter through the EEOC electronic portal, which Plaintiff received on February 12, 2022.

10. Accordingly, Plaintiff timely files this action in accordance with the Notice of Rights, which provided Plaintiff the right to file this Complaint within 90 days of receipt of the Notice.

## NATURE OF THE ACTION

11. Plaintiff brings this action to secure protection of rights granted under the statutes mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief as is necessary to redress the injury to Plaintiff resulting from Defendant's violation of those statutes.

12. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, emotional tranquility, and denial of her constitutional and statutory rights.

13. The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to named Plaintiff.

## PARTIES

14. Plaintiff, Detective Dominique Wiggins, is an African American female who resides in Harford County, Maryland.

15. Defendant is a municipal police force, whose jurisdiction encompasses Baltimore, Maryland, the State's largest city.

16. The Baltimore Police Department ("Defendant" or "BPD") is the 8th largest municipal police force in the United States, staffed by nearly 3,100 civilian and sworn personnel. The Department's jurisdiction covers Maryland's largest city, with a population of approximately 611,648 people.

17. Det. Wiggins works at the Baltimore Police Department ("BPD").

18. During the relevant period, Defendant employed Plaintiff, Det. Wiggins.

19. During the relevant period, Plaintiff was Defendant's employee within the meaning, and entitled to the protections of Title VII.

## FACTUAL ALLEGATIONS

20. Plaintiff, Det. Dominique Wiggins, has been employed by Defendant, the Baltimore Police Department ("BPD") since 2008 until present.  Plaintiff currently works as a Detective with BPD.

21. On or around August 26, 2018, Plaintiff along with several other women gave their friend, Wanda Johnson, a surprise bridal shower/bachelorette party.  The bridal shower began at approximately 3 p.m. at Home Maid restaurant located at 1400 Key Highway, Baltimore, MD.

22. Plaintiff and her friends spent a few hours at the restaurant celebrating Ms. Johnson's upcoming wedding along with Ms. Johnson's family.  Upon finishing brunch, a group of approximately ten (10) individuals who attended the brunch went across the street to a restaurant/bar named Little Havana.  The celebration continued until the group decided to head to the Marriott Waterfront Hotel lounge while they waited for the bachelorette party, which was scheduled for the same day, to begin.

23. At about 10:00pm or 11:00pm, the group proceeded to the Norma Jeans Night Club located at 10 Custom House Lane, Baltimore, MD.   Upon arrival, the group was escorted to the VIP section that they had purchased for the special occasion.

24. While enjoying themselves in the venue, two (2) younger women entered the group's reserved VIP section and sat on an unoccupied bend in the corner of the sectional sofa. Three (3) members of the entourage, including Plaintiff, informed the women that they had paid for the VIP section and that they needed to leave before the bride returned from the restroom.  One of the women indicated that her feet hurt and she would not leave until she was ready.  At this point, security was notified and the women were escorted out of the VIP section before the bride returned.

25. Several members of the group were shaken by the confrontation especially because one of the women who had been escorted out continued to cause a commotion outside of the section.  The bride and a relative were standing by the entrance of the section along with

security and the women who had been escorted.  All of a sudden, Plaintiff's attention was caught by a commotion when the bride and her relative were pulled into the crowd. Plaintiff immediately ran out of the VIP section to figure out what was going on and to offer help.  Plaintiff lost her shoe in the process, but was able to help the bride and her relative back into the VIP section.

26. Security proceeded to escort the two women who had intruded into the VIP section out of the club and Plaintiff attempted to calm everyone in the group down while she simultaneously looked for her shoe.  The bride's husband, which was her fiancé at the time, soon arrived to escort the bride home.

27. Upon retrieving her shoe, Plaintiff exited the club.  Plaintiff began to walk towards Baltimore Street and observed another member of the group who was also a member of BPD, Ms. Henrietta Middleton, walking towards her saying something that Plaintiff was unable to hear.  Ms. Middleton soon caught up with Plaintiff and Plaintiff told her that they should leave, or words to that effect.

28. At the same time, Plaintiff observed a police officer, who was later identified as Sgt. Marlon Koushall, exit a marked patrol vehicle and walk over to Plaintiff and Ms. Middleton.  Sgt. Koushall appeared to say something that Plaintiff was unable to hear before striking Ms. Middleton in the face causing her to stumble away from where they were standing.

29. Plaintiff immediately began to yell "Stop! What are you doing?" while running to aid Ms. Middleton.  Other police officers who were in the vicinity attempted to stop Plaintiff from rendering aid to Ms. Middleton, so she began to yell that they were police officers and Ms. Middleton was a sergeant.

30. Then, an unknown officer moved Plaintiff by her waist before she was finally able to reach Ms. Middleton.  It was obvious that Plaintiff and Ms. Middleton were being treated as aggressors and suspects despite Plaintiff identifying herself as a police officer.

31. At this point, Ms. Middleton was placed against the patrol vehicle and Sgt. Koushall grabbed Ms. Middleton's wrist and stated that she was under arrest.  As Sgt. Koushall was attempting to place Ms. Middleton in handcuffs, Sgt. A. Davis approached the scene and spoke with Plaintiff because they are familiar with each other through BPD.

32. Plaintiff explained to Sgt. Davis what had occurred and Sgt. Davis stated that he would remove Ms. Middleton from the scene given the commotion it was causing.  Sgt. Davis and Plaintiff approached Ms. Middleton and escorted her to the Central District.  Once at the Central District, Ms. Middleton's handcuffs were removed and Sgt. Davis asked Ms. Middleton if she needed medical attention and then requested a medic.

33. Per policy, Sgt. Davis then separated Plaintiff and Ms. Middleton and informed Internal Affairs (IA) of the incident.  Plaintiff attempted to notify her supervisor Sgt. Gloria Davis of what had occurred, but due to the late hours, Plaintiff was not able to reach her at the time.

34. Sgt. Raymond Lloyd of the Internal Affairs Division responded and interviewed all of the officers who were involved in the incident.  Sgt. Lloyd asked questions in reference to the incident between Sgt. Koushall and Ms. Middleton.  He also asked if an incident occurred inside of the club and Plaintiff informed him about the situation with the two women who had entered the VIP section.

35. In terms of Plaintiff, Sgt. Lloyd indicated that his interview of Plaintiff was simply a witness statement. At no point during his interview of Plaintiff did Sgt. Lloyd read Plaintiff her Miranda rights nor provide her with her Law Enforcement Bill of Rights (LEOBR).

36. Upon completion of the interview, Plaintiff checked in on Ms. Middleton to retrieve her keys so that Plaintiff could gather her belongings from Ms. Middleton's truck as she had ridden with her to the bridal shower.  Plaintiff also informed her supervisor, Sgt. Gloria Davis, of what had occurred when she called Plaintiff later that day.

37. In or around January 2019, Ms. Middleton informed Plaintiff that the charges that BPD had brought against her on the night of the incident had been dropped.

38. Around the same time, Plaintiff received a subpoena to testify before the grand jury.  Upon speaking with Mr. Steven Trostle, the Assistant State's Attorney ("ASA"), Plaintiff was informed that she would be testifying in reference to charges being sought against Sgt. Koushall for his assault on Ms. Middleton.  At the grand jury proceeding, city wide camera footage was played showing the incident that occurred between Ms. Middleton and Sgt. Koushall.  Plaintiff was asked several questions by ASA Trostle and members of the grand jury in reference to what was happening during the video.

39. In or around February 2019, Sgt. Koushall was formally charged with assault on Ms. Middleton.

40. On or about June 20, 2019, Plaintiff received a notice of Internal Investigation alleging that on August 26, 2018, she and other members of BPD who were part of the bridal party were involved in a physical altercation.  Plaintiff was told by Det. Gertz, the investigating IA detective, that this was to investigate what had occurred *inside* the club and not what took place between Sgt. Koushall and Ms. Middleton.

41. Plaintiff was shocked by the allegation as she had no indication that her statement on August 26, 2018 would be used against her in any way.  Given BPD's culture of retaliation, Plaintiff believed that this was in retaliation for her testimony to the grand jury against Sgt. Koushall.

42. Upon receiving an attorney through the Fraternal Order of Police ("FOP"), Plaintiff was informed that a notice of declination had been given by the ASA Trostle on June 14, 2019 "declining to take any legal action against Det. Wiggins" in reference to the incident inside of the club.

43. Also, on or about June 20, 2019, Plaintiff was served with a notice of internal investigation for allegedly making a threatening phone call to a fellow officer, which was allegedly related to an incident on or about April 18, 2019, when Plaintiff received a video of Officer ("Ofc.") Yolanda Nelson talking on the phone to an unknown individual while at the doctor's office.  During the phone call Ofc. Nelson could be heard talking about what she told Sgt. Koushall to say and write about the incident outside of the club. Additionally, Ofc. Nelson could be heard referring to Plaintiff as a "bitch."

44. Upon seeing and hearing the recording, Plaintiff called Ofc. Nelson because Plaintiff had previously believed that Ofc. Nelson was a friend of hers. During that conversation, Plaintiff told Ofc. Nelson to stop speaking about her or the incident because she was not present at the time Sgt. Koushall struck Ms. Middleton.  Ofc. Nelson asked Plaintiff if she was "threatening" her and Plaintiff responded that she was not.  As Ofc. Nelson got more aggressive during the call, Plaintiff told her to have a wonderful day and hung up.

45. Several days after the phone call, Ms. Middleton provided IA the video of Ofc. Nelson. It was only after Ofc. Nelson was confronted with the video, that she alleged that Plaintiff had threatened her.

46. With this occurrence, Plaintiff felt even more certain that she was being targeted by BPD for her involvement in the case against Sgt. Koushall.

47. On or about August 13, 2019, Plaintiff received a notification of non-sustained findings for the complaint.

48. In or around September 2019, court proceedings were held against Sgt. Koushall, during which Plaintiff testified for the State and Sgt. Koushall was found guilty of assault in October 2019.

49. In or around November 2019, Sgt. Koushall filed an appeal of his guilty verdict.

50. On or around December 2, 2019, Plaintiff signed for a notice of internal investigation dated November 22, 2019. The notice advised Plaintiff that she had committed perjury, stating that "the nature of the investigation involves, amongst other things the following: During the Circuit Court case #119038015, the *State of Maryland v. Marlon Sampson Koushall*, which took place September and October of 2019, testimony revealed that you perjured yourself while giving testimony under oath." The notice did not state what was said that was considered perjury and no other information was given in reference to the notice.

51. Once again, BPD's targeting of Plaintiff became abundantly clear and was specifically linked to her involvement in the case against Sgt. Koushall and her status as an African American woman.

52. On or about May 27, 2020, a Notice of Order to Appear was issued to Plaintiff to give a phone statement on June 4, 2020 in reference to the investigation about the "club incident" that occurred almost two years prior.

53. On or about June 9, 2020, Plaintiff received a letter of sustained findings for alleged misconduct and false statements.  As a result, Plaintiff learned that she was going to be suspended pending termination on June 12, 2020 based on the findings of Det. Gertz that "Detective Dominique C. Wiggins gave false statements in her taped interviews from August 26, 2018 and June 4, 2020, in reference to the events that occurred at Norma Jean's."

54. The letter in summary stated further, "Detective Wiggins contradicted her testimonies in her statements. In her statement the night of the incident to Sergeant Lloyd, Detective Wiggins stated the incident inside the club was a melee involving the group sitting next to theirs and someone she didn't know was pulled into the crowd. In her statement to Detective Gertz, Detective Wiggins advised she and two women from her group had security remove a female from their section in the club. She then said Detective Wanda Johnson somehow got pulled into the situation and she had to slap and push her out to calm her down. Detective Wiggins stated a fight did not occur, but is captured on Norma Jean's surveillance video #14 pushing females from her group out of the fight."

55. Plaintiff maintained that her statements on August 26, 2018 and June 4, 2020 were not comparable because her August 26, 2018 statement was given solely under the impression and for the purposes of being a witness statement.  The inconsistencies in her statement on August 26, 2018 and June 4, 2020 were easily explained by the information that Plaintiff

was able to clarify and learn additional information about that incident in the almost two years that had passed since her witness statement on August 26, 2018.

56. Plaintiff was intentionally misled by investigating detectives that her statement on August 26, 2018 was a witness statement when in reality she was being questioned for misconduct, unbeknownst to her.  Detectives were seeking an incriminating statement from Plaintiff and believed her to be a suspect in the matter for no other reason than she was an African American woman.

57. Det. Getz purposefully mischaracterized Plaintiff's statement to claim that she was involved in a physical altercation due to Plaintiff's use of the word "melee."  However, Plaintiff simply used the word to describe the commotion and confusion that had occurred *not* to indicate or imply that she had been involved in a fight.  Det. Getz's characterization that Plaintiff slapped and pushed Mrs. Johnson thus indicating a fight, was also untrue as Plaintiff had only responded that she had pushed Mrs. Johnson's sister away from fighting to protect her.  Further, Plaintiff's admission only came after Det. Getz asked Plaintiff if she recalled "pushing a female."

58. On or about October 15, 2020, Plaintiff attended a trial board hearing to determine whether or not she would be terminated.

59. Plaintiff was shocked that she was immediately moved towards termination as in similar cases where White male and female or Black male officers and supervisors suspected of misconduct or other severe offenses were not subjected to the same punishment.  Examples of comparators include:

   a. Major James Handley (White/male) called an applicant a "fucking nigger." The case was sustained, but he was given the opportunity to retire without reprimand.

b. Major Brian Hance (Black/male) was suspended for passing an applicant through the hiring process who was not eligible to be hired.  The case was sustained and Major Hance was demoted and has since retired.

c. Lt. William Colburn (White/male) had several sustained DUI cases and a fleeing and eluding police charge. He was ultimately suspended then reinstated with minimal punishment and allowed to keep his rank. Lt. Colburn has since retired from the Department.

d. Sgt. Dontae Foster (Black/male) had several sustained DUI's. Sgt. Foster was suspended and reinstated with a loss of rank (where he was demoted to officer).

e. Officer Devin Yancy (Black/male) had been charged with 'use of force' on a male suspect. Ofc. Yancy was suspended pending termination and chose to take the punishment of a loss of 15 days of leave instead of having a trial board due to the lengthy wait for a trial board hearing.

f. Officer Jason Zimmerman (White/male) was charged with 'use of force' for punching a male in the face several times who was suffering from a behavioral crisis. Ofc. Zimmerman received no suspension, and instead he received a severe letter of reprimand and a loss of 5 days of leave. Sometime later, Ofc. Zimmerman was suspended awaiting a declination letter for a police officer involved shooting.

g. Sgt. Amy Street (White/female) was involved in a domestic related assault with her husband, Sgt. Craig Street. Both officers were suspended, however the trial board hearing was dismissed, and charges were dropped due to what was referred to as an improper investigation by the investigating detective.

h.  Sgt. Koushall (Black/male) has remained on the force despite being found guilty of assault.  Sgt. Koushall only received a departmental charge of conduct unbecoming when he was found in violation of false representation of facts and making false statements.

60. The misinterpretations and mischaracterizations of Plaintiff's statements that somehow in the purview of BPD have been used as a basis to substantiate the severe  punishment that has been issued to her, is an unequivocal demonstration of discriminatory treatment when comparing her seemingly disproportionate treatment and punishment to similarly situated colleagues. Det. Getz had no former interactions with Plaintiff that could possibly explain this malicious motive other than BPD's culture of disproportionate penalty and punishment of Black women, such as Plaintiff as a result of her status as an African American woman.

61. Plaintiff continues to work in a hostile work environment where she fears discrimination based on sex, race, and retaliation.

62. Additionally, during her suspension, she was further subjected to retaliatory actions by her supervisors, which based on reason and belief is related to her complaining about Sgt. Koushall.

63. The Defendants' discriminatory practices have been effectuated in violation of federal and state statutes, including Title VII of the Civil Rights Act, Section 1983, and FEPA.

## COUNT I

## VIOLATION OF TITLE VII - RACE DISCRIMINATION

64. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

65. A *prima facie* case of race discrimination requires a showing of four (4) elements: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

66. Here, the four (4) elements of a *prima facie* case of race discrimination are met. The Plaintiff is African American, a woman, and is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964. Additionally, Plaintiff is a qualified police officer, as she has approximately fourteen (14) years on the force and attained the title of Detective. The Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when she was prejudicially treated as a suspect on the night in question even after she properly identified herself as law enforcement. Second, when the investigators continued to make false allegations against her that ultimately resulted in charges despite Plaintiff's consistent efforts to assist investigators in every capacity. Finally, the charges that were brought against Plaintiff were disproportionate in comparison to her actual involvement in the incident, as well as the charges that her colleagues and superiors of different races and sex had brought against them for more egregious offenses.

67. Plaintiff is a member of a protected class as an African American woman.

68. Because of her race, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII.

69. Defendants' foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

70. Defendant knew that Plaintiff was African American prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of her race.

71. Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her race.

72. Defendant had limited and reprimanded Plaintiff in a way that deprived her of workplace safety and otherwise adversely affected her status as an employee because of her race.

73. Other employees who were similarly situated, but were non-Hispanic or Caucasian individuals, which is different from the Plaintiff, have been treated more favorably than the Plaintiff with regards to the terms and conditions of employment and workplace conditions.

74. Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

75. Plaintiff's race was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

76. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

77. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of her race.

78. Defendant discriminated against Plaintiff because of her race by engaging in, tolerating, or failing to prevent race discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

79. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

80. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies.

81. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature.

82. Further, Defendant's treatment and actions are ongoing.

83. Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

84. Similarly, situated non-Hispanic Caucasian employees were not subjected to the same, similar, or any adverse treatment as Plaintiff.

85. Baltimore City Police Department must comply with Title VII, but by and through their conduct, have violated Title VII.

## **COUNT II**

## **VIOLATION OF TITLE VII – SEX DISCRIMINATION (GENDER)**

86. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

87. A *prima facie* case of sex discrimination requires a showing of four (4) elements: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

88. Here, the four (4) elements of a *prima facie* case of sex discrimination are met. The Plaintiff is African American, a woman, and is considered a member of a protected class. The Plaintiff is a qualified police officer, as she has approximately fourteen (14) years on the force and maintained the title of Detective. The Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII when she was prejudicially treated as a suspect on the night in question even after she properly identified herself as law enforcement. Further, The Plaintiff faced discrimination, when the investigators continued to make false allegations against her that ultimately resulted in charges despite Plaintiff's consistent efforts to assist investigators in every capacity and when the charges that were brought against Plaintiff were disproportionate in comparison to her actual involvement in the incident, as well as the charges that her colleagues and superiors of different races and sex had brought against them for more egregious offenses. The above-mentioned actions by the Defendants towards the Plaintiff demonstrates the discriminatory and prejudicial manner in which the Defendants treated the Plaintiff and her lawful claims against them.

89. Defendant treated Plaintiff less favorably than similarly situated male employees.

90. Because of her sex, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint under Title VII.

91. Defendant's foregoing unlawful adverse actions materially affected the terms, privileges and conditions of Plaintiff's employment.

92. Defendant knew that Plaintiff was a woman prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of her sex.

93. Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her sex.

94. Defendant has limited, segregated and classified Plaintiff in a way that deprived her of employment opportunities and otherwise adversely affected her status as an employee because of her sex.

95. Other employees who were similarly situated, but members of a class (men) different than Plaintiff, have been treated more favorably than Plaintiff in the terms and conditions of employment.

96. Plaintiff's sex was a determining factor in Defendant's unlawful conduct toward Plaintiff.

97. Plaintiff's sex was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

98. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

99. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her sex.

100.    Defendant discriminated against Plaintiff because of her sex by engaging in, tolerating or failing to prevent sex discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

101.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

102.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages – including but not limited to past and future loss of income, benefits, career

opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.

103.    Plaintiff was humiliated, embarrassed and made to endure a great amount of pain and suffering, and her injury is permanent in nature.

104.    Further, Defendant's treatment and actions were ongoing.

105.    Plaintiff has incurred lost wages, loss of reputation now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

## COUNT III

### VIOLATION OF SECTION 1983

106.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

107.    As an African American, Plaintiff is a member of a protected class.

108.    Because of her race (African American), Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint under Section 1983.

109.    Defendant's foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiffs employment.

110.    Defendant knew that Plaintiff is an African American prior to the adverse actions described throughout the Complaint and was aware or should have been aware of the discrimination Plaintiff was subjected to because of her race.

111.    Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her race (African American).

112.     Defendant has limited, segregated, and classified Plaintiff in a way that deprived her of employment opportunities and otherwise adversely affected her status as an employee, because of her race (African American).

113.     Other employees who were similarly situated, but members of a different class than Plaintiff, have been treated more favorably than the Plaintiff in the terms and conditions of employment.

114.     Plaintiff consistently attempted to report the pervasive culture and custom within BPD of treating African American officers differently than white officers when it came to promotions, disciplinary actions, and conduct.

**115.**     Plaintiff's allegations clearly show a custom of discrimination as required by Section 1983.

116.     Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

117.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

118.     Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race (African American).

## <u>COUNT IV</u>

## **VIOLATION OF THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT (FEPA)**

119.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

21

120.     The Maryland Fair Employment Practices Act (FEPA), Md. Code Ann., State

Gov't, § 20-601 et seq. outlaws discrimination in employment based on race, color,

religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic

information, or disability by employers with more than 15 employees.

121.     Under FEPA, an employer can be held legally responsible if the person responsible

for the harassment can make or recommend employment decisions (e.g., hiring and firing,

promotion and demotion, and reassignments) or directs, supervises, or evaluates the work

activities of the employee, even if that person does not have the power to make employment

decisions.   Additionally, an employer can be liable if its own negligence leads to

harassment or enables harassment to continue.

122.     Harassment is unwelcome or offensive conduct that is based on "race, color,

religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender

identity, or disability."

123.     Here, the Plaintiff was subjected to harassment or offensive conduct that is based

on race and sex, where she was subjected to ongoing harassment, including but not limited

to, highly inappropriate and offensive sexual comments. The Plaintiff was subjected to

harassment when she was prejudicially treated as a suspect on the night in question even

after she properly identified herself as law enforcement. Further, The Plaintiff faced

discrimination, when the investigators continued to make false allegations against her that

ultimately resulted in charges despite Plaintiff's consistent efforts to assist investigators in

every  capacity  and  when  the  charges  that  were  brought  against  Plaintiff  were

disproportionate in comparison to her actual involvement in the incident, as well as the

charges that her colleagues and superiors of different races and sex had brought against

them for more egregious offenses. The above-mentioned actions by the Defendants towards the Plaintiff demonstrates the discriminatory and prejudicial manner in which the Defendants treated the Plaintiff and her lawful claims against them.

124.    The Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race (African American) and sex (female).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Detective Dominique Wiggins, respectfully prays that this Court grant her the following relief:

a.   Enter a declaratory judgement finding that the foregoing actions of Defendant violated Title VII, Section 1983, and FEPA;

b.   Enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c.   Award back pay and compensatory damages in the amount of $1,000,000 (one-million dollars and zero cents) that would fully compensate Plaintiff for the economic loss, loss of promotional potential, reputation, lost wages, lost job benefits; physical and psychological injury, humiliation, embarrassment; and mental and emotional distress caused by the conduct of the Defendant alleged herein;

d.   Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

e.   Order such other relief as this Court deems just and equitable.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable herein.

Dated: May 4, 2022

Respectfully submitted,

_____
Dionna Maria Lewis, Esq.
District Legal Group, PLLC
Bar No. 19486
700 Pennsylvania Ave, SE, Suite 2098
Washington, D.C. 20003
Phone: (202) 486-3478
Dionna@DistrictLegalGroup.com
*Counsel for Plaintiff Dominique Wiggins*