**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DOMINIQUE C. WIGGINS,                    *

Plaintiff,                               *

v.                                       *          Civil Action  MJM-22-1089

BALTIMORE POLICE DEPARTMENT,             *

Defendant.                               *

* * * * * * * * * * *

**<u>MEMORANDUM OPINION</u>**

Dominique C. Wiggins ("Plaintiff") commenced this civil action against her employer Baltimore Police Department ("Defendant" or "BPD") alleging violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); 42 U.S.C. § 1983; and the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't, § 20-601, *et seq.* ("MFEPA").[1] The Complaint contains four counts:

   (1)      Count I: Violation of Title VII – Race Discrimination;

   (2)      Count II: Violation of Title VII – Sex Discrimination (Gender);

   (3)      Count III: Violation of Section 1983; and

   (4)      Count IV: Violation of the Maryland Fair Employment Practices Act (MFEPA).

Currently pending is Defendant's Motion to Dismiss Plaintiff's Complaint. (ECF 9). Plaintiff filed a memorandum in opposition to the motion (ECF 11), and Defendant filed a reply memorandum (ECF 17). The Court has reviewed the filings and finds that no hearing is necessary.

---

[1] The parties have consented to proceed before a United States magistrate judge pursuant to 28 U.S.C. § 636(c). (ECF 16).

L.R. 105.6. For the reasons stated below, Defendant's motion will be granted, and Plaintiff's claims will be dismissed without prejudice.

### I.        Background[2]

Plaintiff, an African American female police detective, has been employed by BPD since 2008. (Compl. ¶ 20). On or about August 26, 2018, she and "several other women gave their friend . . . a surprise bridal shower/bachelorette party." (Compl. ¶ 21). After celebrating at various restaurants and bars, around 10:00 or 11:00 p.m., "the group proceeded to the Norma Jean's Night Club" in downtown Baltimore, Maryland. (Compl. ¶¶ 21–23). "[T]he group was escorted to the VIP section that they had purchased for the special occasion." (Compl. ¶ 23). Two younger women subsequently entered the group's VIP section without invitation. (Compl. ¶ 24). Security was notified, and the women were escorted out of the VIP section. (*Id.*)  One of the women who had been escorted out continued to cause a commotion outside of the VIP section, and "the bride and her relative were pulled into the crowd." (Compl. ¶ 25). Plaintiff ran out of the VIP section to help the bride and her relative back into the VIP section. (*Id.*) Security escorted the two women who had intruded into the VIP section out of the club. (Compl. ¶ 26). The bride's then-fiancé soon arrived to escort the bride home. (*Id.*) Plaintiff also exited the club. (Compl. ¶ 27).

As she began to walk towards Baltimore Street, Plaintiff saw a member of her group, also a BPD member, Henrietta Middleton walking toward her, and Plaintiff told Middleton that they should leave. (*Id.*) "At the same time, Plaintiff observed a black male police officer, . . . later

---

[2] The facts described herein are drawn from allegations in Plaintiff's Complaint and are accepted as true solely for purposes of resolving Defendant's motion. When resolving a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts are generally limited to considering the allegations set forth in the complaint and documents that are either attached to the complaint or "explicitly incorporated into the complaint by reference[.]" *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *see also* Fed. R. Civ. P. 10(c).

identified as Sgt. Marlon Koushall, exit a marked patrol vehicle and walk over to Plaintiff and Middleton." (Compl. ¶¶ 28, 59). "Koushall appeared to say something that Plaintiff could not hear, before striking Middleton in the face[,] causing her to stumble away from where they were standing." (*Id.*) Plaintiff yelled, "Stop! What are you doing?" while "running to aid Middleton." (Compl. ¶ 29). "Other officers who were in the vicinity attempted to stop [her] from rendering aid to Middleton, so Plaintiff yelled that she and Middleton were police officers and Middleton was a sergeant." (*Id.*) "[A]n unknown officer moved Plaintiff by her waist before she was finally able to reach Middleton." (Compl. ¶ 30). At this point, Middleton was placed against the patrol vehicle, and Koushall grabbed Middleton's wrist and stated that she was under arrest. (Compl. ¶ 31).

As Koushall was attempting to place Middleton in handcuffs, another officer who was familiar with Plaintiff "approached the scene and spoke with Plaintiff. . . ." (*Id.*) Plaintiff and the officer escorted Middleton to BPD Central District, where Middleton's handcuffs were removed. (Compl. ¶ 32). "Per policy," the officer separated Plaintiff and Middleton and informed BPD Internal Affairs ("IA") of the incident. (Compl. ¶ 33).

"Sgt. Raymond Lloyd of IA responded and interviewed all of the officers involved in the incident." (Compl. ¶ 34). Lloyd asked questions regarding the incident between Koushall and Middleton. (*Id.*) "He also asked if an incident occurred inside of the club, and Plaintiff informed him about the situation with the two women who had entered the VIP section." (*Id.*) "Lloyd indicated that his interview of Plaintiff was simply a witness statement." (Compl. ¶ 35). During his interview of Plaintiff, Lloyd did not read Plaintiff her Miranda rights and did not provide her with Law Enforcement Officers' Bill of Rights ("LEOBR"). (*Id.*)

In or around January 2019, Middleton informed Plaintiff that the charges that BPD had brought against her on the night of the incident had been dropped. (Compl. ¶ 37). Around the same

time, Plaintiff received a subpoena to testify before a grand jury in reference to charges being sought against Koushall for his assault on Middleton.  (Compl. ¶ 38). Plaintiff eventually testified before the grand jury. (*Id*.) In or around February 2019, Koushall was charged with the assault on Middleton. (Compl. ¶ 39).

"On or about June 20, 2019, Plaintiff received notice of an IA investigation alleging that on August 26, 2018, she and other BPD members who were part of the bridal party were involved in a physical altercation." (Compl. ¶ 40). Det. Gertz, the investigating IA detective, told Plaintiff that the investigation concerned events inside the club, not the altercation between Middleton and Koushall. (*Id*.) Plaintiff believed that this investigation was undertaken in retaliation for her grand jury testimony against Koushall. (Compl. ¶ 41). Plaintiff was informed by an attorney through the Fraternal Order of Police that the prosecutor's office had issued a notice "declining to take any legal action against [Plaintiff]" in reference to the incident inside the club. (Compl. ¶ 42).

"[O]n or about June 21, 2019, Plaintiff was served with a notice of internal investigation for allegedly making a threatening phone call to a fellow officer," Yolanda Nelson, in April of 2019. (Compl. ¶ 43). Plaintiff had received a video in which Nelson was speaking on the phone to an unknown individual about "what she told Sgt. Koushall to say and write about the incident outside of the club." *Id.* In that video, "Nelson could be heard referring to Plaintiff as a 'bitch.'" (*Id*.) Plaintiff called Nelson and told her to stop speaking about her or the incident because Nelson was not present at the time Koushall struck Middleton. (Compl. ¶ 44). When Nelson asked Plaintiff if she was threatening Nelson, Plaintiff denied that she was threatening her. (*Id*.) Middleton provided the video to IA several days after this phone call. (Compl. ¶ 45). When Nelson was confronted with the video, she alleged that Plaintiff had threatened her. (*Id*.) This incident made Plaintiff "fe[el] even more certain that she was being targeted by BPD for her involvement in the

4

case against Sgt. Koushall." (Compl. ¶ 46). On or about August 13, 2019, Plaintiff received notification that Nelson's IA complaint against her was not sustained. (Compl. ¶ 47).

In or around September 2019, Plaintiff testified for the prosecution in court proceedings against Koushall, and in October 2019, Koushall was found guilty of assault. (Compl. ¶ 48). Koushall filed an appeal of his conviction. (Compl. ¶ 49). On or around December 2, 2019, Plaintiff was advised that IA was investigating her for perjury regarding her testimony in Koushall's trial. (Compl. ¶ 50). Plaintiff felt that she was being targeted by BPD for "her involvement in the case against Koushall and her status as an African American woman." (Compl. ¶ 51).

On or about May 27, 2020, Plaintiff was ordered to "give a phone statement on June 4, 2020, in reference to the investigation about the 'club incident' that occurred almost two years prior." (Compl. ¶ 52). On or about June 9, 2020, Plaintiff received a letter of sustained findings against her for "alleged misconduct and false statements." (Compl. ¶ 53). "Plaintiff learned that she was going to be suspended pending termination on June 12, 2020," based on Gertz's findings that Plaintiff "gave false statements in her taped interviews from August 26, 2018 and June 4, 2020, in reference to the events that occurred at Norma Jean's." (*Id.*) "Plaintiff maintained that her statements on August 26, 2018 and June 4, 2020 were not comparable because her August 26, 2018 statement was given solely under the impression and for the purposes of being a witness statement." (Compl. ¶ 55). While acknowledging there were "inconsistencies" in her statements on August 26, 2018, and June 4, 2020, Plaintiff contends that these inconsistencies were "easily explained" by Plaintiff's clarification and having "learn[ed] additional information" about that the events of August 26, 2018, in "the almost two years that had passed since her witness statement" at that time. (*Id.*) Plaintiff alleges that she "was intentionally misled by investigating detectives

that her statement on August 26, 2018 was a witness statement when in reality she was being questioned for misconduct, unbeknownst to her." (Compl. ¶ 56). According to Plaintiff, the investigating detectives "were seeking an incriminating statement from Plaintiff and believed her to be a suspect in the matter for no other reason than she was an African American woman." (*Id.*)

On or about October 15, 2020, Plaintiff attended a trial board hearing to determine whether she would be terminated.[3] (Compl. ¶ 58). Plaintiff alleges that while she was "immediately moved towards termination[,]"white male and female and black male officers and supervisors "suspected of misconduct or other severe offenses were not subjected to the same punishment." (Compl. ¶ 59). Plaintiff names several putative comparators, describing each individual by their race, their sex or gender, their alleged misconduct or charges, and any discipline they received. (*Id.*)

Plaintiff alleges that "misinterpretations and mischaracterizations" of her statements have been used by Defendant to substantiate "the severe punishment that has been issued to her[]" and demonstrates "discriminatory treatment. . . ." (Compl. ¶ 60). Plaintiff attributes her "punishment" to "BPD's culture of disproportionate penalty and punishment of Black women," noting that Gertz "had no former interactions with Plaintiff that could possibly explain" BPD's "malicious" treatment of her. (*Id.*) Plaintiff further alleges that she "continues to work in a hostile work environment where she fears discrimination based on sex, race, and retaliation." (Compl. ¶ 61). She finally alleges that "during her suspension, she was further subjected to retaliatory actions by her supervisors[]" she contends, "based on reason and belief[,]" is related to her statements and testimony about Koushall. (Compl. ¶ 62).

Plaintiff filed a charge with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission ("EEOC") on March 1, 2021, alleging discrimination based on race and

---

[3] Although the Complaint characterizes the proceeding as "punishment," it does not describe the outcome of the trial board.

sex. (Compl. ¶ 8). She received her right-to-sue letter on February 12, 2022.  (Compl. ¶ 9). This action was filed on May 4, 2022. (ECF 1).

## II.      Legal Standard

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This rule is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted). A motion to dismiss under Rule 12(b)(6) constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A complaint need not include "detailed factual allegations" to satisfy Rule 8(a)(2), but it must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if ... [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 555–56 (internal quotation marks omitted). Furthermore, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (internal quotation

marks, brackets, and citation omitted). A complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level[,]" *id.*, and "tender[ing] 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice, *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

The purpose of a Rule 12(b)(6) motion is to "test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."[4] *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999)). Thus, when considering a motion to dismiss, a court must take the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Id.* at 212. At the same time, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" the defendant's liability for the alleged wrong and the plaintiff's entitlement to the remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

III.   **Analysis**

A. **Title VII Discrimination Claims: Count I (Race) & Count II (Gender)**

Title VII provides a cause of action against employers for discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment,

---

[4] In the relatively rare circumstances where all facts necessary to an affirmative defense clearly appear on the face of the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6). *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (*en banc*) (internal citations omitted).

because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). This proscription is "often referred to as the 'disparate treatment' (or 'intentional discrimination') provision. . . ." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015).

"[T]he elements of a *prima facie* case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30 (2012) (citation omitted). A plaintiff is not required to plead a *prima facie* case to state a claim of unlawful discrimination under Title VII that survives a motion to dismiss. *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584–85 (4th Cir. 2015). Even still, "a Title VII complaint is . . . subject to dismissal if it does not meet the ordinary pleadings standard under *Twombly* and *Iqbal*." *Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 747-48 (4th Cir. 2017). Therefore, a plaintiff must allege sufficient facts "to satisfy the elements of a cause of action created by [Title VII]." *McCleary-Evans*, 780 F.3d at 585 (internal quotation marks omitted). In a Title VII discrimination case, a plaintiff must plausibly allege discriminatory conduct on account of a protected status, such as race or sex. *See Felder v. MGM Nat'l Harbor, LLC*, No. 20-2373, 2022 WL 2871905, at *1 (4th Cir. July 21, 2022) (citation omitted). Although pleading all elements of a *prima facie* case is not strictly required, reference to the elements of a *prima facie* case may inform a court's assessment of a motion to dismiss a Title VII claim. *Yampierre v. Baltimore Police Dep't*, Civ. No. ELH-21-1209, 2022 WL 3577268, at *16 (D. Md. Aug. 18, 2022) (citations omitted).

Defendant argues that Plaintiff fails to plead "adverse employment action and different treatment from similarly situated employees." (Def. Mem. at 6). The Court agrees and finds that the allegations in the Complaint fail to support any reasonable inference of either race or sex discrimination under Title VII.[5]

### 1.  Adverse Employment Action

"An adverse [employment] action is one that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). "Although conduct short of ultimate employment decisions can constitute adverse employment action, there still must be a tangible effect on the terms and conditions of employment." *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 598 (D. Md. 2011), *aff'd*, 465 F. App'x 274 (4th Cir. 2012) (quoting *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 737 n. 6 (D. Md. 2009)). "[C]ourts have found that a claim for 'disparate investigation' is insufficient to state a claim for discrimination under Title VII where the plaintiff failed to allege also 'that the investigation resulted in some form of employment injury. . . .'" *Yampierre*, 2022 WL 3577268, at *26 (citing *Jenkins v. Balt. City Fire Dep't*, 862 F. Supp. 2d 427, 446 (D. Md. 2012), *aff'd*, 419 F. App'x 192 (4th Cir. 2013) (per curiam)).

Placing an employee on paid leave is generally considered not to be an adverse employment action. *See, e.g.*, *Nzabandora v. Rectors & Visitors of Univ. of Va.*, 749 F. App'x 173, 175 (4th Cir. 2018) ("[Plaintiff's] placement on paid leave pending investigations into her alleged

---

[5] As to the first two prongs of the *prima facie* case, the Court notes Plaintiff's allegations that (1) she is an African American woman; and (2) she "is a qualified police officer, as she has approximately fourteen (14) years on the force and attained the title of Detective." (Compl. ¶ 66).

misconduct also does not constitute adverse employment action for purposes of Title VII."); *Mason v. Montgomery Cnty Police Dep't*, No. 8:13-cv-01077-AW, 2013 WL 6585928, at *5 (D. Md. Dec. 13, 2013) ("[P]lacing an employee on paid administrative leave with full benefits is typically not considered a materially adverse action") (collecting cases).  In contrast, placing an employee on leave without pay could be an adverse action. *See, e.g.*, *Snyder v. Azar*, Civ. No. TDC-18-0511, 2020 WL 4605223, at *6 (D. Md. Aug. 10, 2020), *aff'd sub nom. Snyder v. Becerra*, No. 20-2073, 2021 WL 5505403 (4th Cir. Nov. 24, 2021) (finding that the suspension of Plaintiff for five days without pay qualifies as an adverse employment action because it had a "significant detrimental effect" by causing a "decrease in compensation").

None of the employer actions alleged in the Complaint constitutes an adverse employment action sufficient to state a plausible claim of discrimination under Title VII. Plaintiff alleges that she was subject to multiple internal investigations in 2019 and 2020.  (*See*, *e.g.*, Compl. ¶¶ 40, 43, 50). Without any injury to Plaintiff's employment status, the internal investigations were not adverse employment actions. *See Jenkins*, 862 F. Supp. 2d at 446; *Yampierre*, 2022 WL 3577268, at *26. One of the investigations led to "sustained findings for alleged misconduct and false statements" and "[a]s a result," a suspension of Plaintiff "pending termination" in June 2020. (Compl. ¶ 53; Def. Mem. at 7; Pl. Opp'n 4–5). However, the Complaint does not include any details as to the terms of Plaintiff's suspension, such as whether she was suspended without pay or whether the suspension had any significant, tangible effect on the terms and conditions of employment. *See Nzabandora*, 749 F. App'x at 175; *Thorn*, 766 F. Supp. 2d at 598. And the Complaint does not otherwise allege facts to suggest that the internal investigations and suspension "*pending* termination" resulted in any change in benefits or had any significant impact on Plaintiff's employment status, such as *actual* termination. *See Hoyle*, 650 F.3d at 337.

Plaintiff alleges that (1) "she was prejudicially treated as a suspect on the night [of the night club incident,] even after she properly identified herself as law enforcement"; (2) "the investigators continued to make false allegations against her that ultimately resulted in charges despite Plaintiff's consistent efforts to assist investigators in every capacity"; and (3) "the charges that were brought against [her] were disproportionate in comparison to her actual involvement in the incident." (Compl. ¶¶ 66, 88). None of this conduct on its face constitutes "a significant change in employment status, . . . or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 337, and the Complaint does not allege that any of this conduct had "a tangible effect on the terms and conditions of [Plaintiff's] employment[,]" *Thorn*, 766 F. Supp. 2d at 598. Notwithstanding Plaintiff's conclusory description of her experiences at BPD as "severe punishment," (Compl. ¶ 60), she ultimately fails to plead that she suffered an adverse employment action by Defendant that could sustain any claim of unlawful race or sex discrimination.

### 2. Inference of Unlawful Discrimination

In the absence of direct or circumstantial evidence, a plaintiff alleging race or sex discrimination in employment may make a *prima facie* showing that she suffered an adverse employment action "under circumstances giving rise to an inference of unlawful discrimination." *Swaso*, 698 Fed. App'x at 747 (quoting *Adams v. Tr. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011)). This element "is met if 'similarly-situated employees outside the protected class received more favorable treatment.'" *Id.* (quoting *White v. BFI Waste Services*, 375 F.3d 288, 295 (4th Cir. 2004)). When a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination, "[t]he similarity between comparators . . . must be clearly established in order to be meaningful." *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008). "Such a showing would include evidence

that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). In essence, "the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Swaso*, 698 Fed. App'x at 748 (quoting *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011)).

Scrutiny of comparator evidence typically does not occur at the Rule 12(b)(6) stage of litigation. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022) (citations omitted). Nevertheless, a plaintiff who relies on comparators to plead a plausible claim of employment discrimination "must identify the proposed comparator and 'establish a plausible basis for believing [the plaintiff and proposed comparator were] actually similarly situated.'" *Asi v. Info. Mgmt. Group, Inc.*, Civ. No. GLR-18-3161, 2019 WL 4392537, at *6 (D. Md. Sept. 13, 2019) (quoting *Coleman*, 626 F.3d at 191).

Here, the Complaint makes reference to several comparators to support an inference of unlawful discrimination by Defendant against Plaintiff. Plaintiff alleges, (1) in June 2020, she was notified of "sustained findings for alleged misconduct and false statements"; (2) a few days later, she "learned that she was going to be suspended pending termination"; and (3) in October 2020, she "attended a trial board hearing to determine whether or not she would be terminated." (Compl. ¶¶ 53, 58). Plaintiff further alleges that she was "immediately moved towards termination" while "White male and female or Black male officers and supervisors suspected of misconduct or other

severe offenses were not subjected to the same punishment." (Compl. ¶ 59). The Complaint then lists eight current or former employees of Defendant, describing each individual by their race, their sex or gender, their alleged misconduct or charges, and any discipline they received. (*Id.*)[6]

The misconduct charged against the proposed comparators vary widely, including use of racial slurs, passing an ineligible applicant through the hiring process, DUI, fleeing and eluding police, use of force, and assault. (*Id.*) Only one comparator, Koushall (black and male), was accused of conduct similar to the findings sustained against Plaintiff—that is, a departmental charge of conduct unbecoming for "false representation of facts and making false statements." (*Id.*) Plaintiff alleges that Koushall "has remained on the force despite being found guilty of assault." (*Id.*) However, Plaintiff has also "remained on the force." Thus, even assuming that the information alleged about Koushall is sufficient to provide "a plausible basis for believing [Plaintiff and Koushall] were actually similarly situated[,]" *Coleman*, 626 F.3d at 191, the Complaint contains no facts to suggest that Koushall "received more favorable treatment" than Plaintiff, *White*, 375 F.3d at 295.

In the absence of any detail about the terms of Plaintiff's suspension, none of the disciplinary actions described for any of the comparators proposed in the Complaint are, on their face, more favorable than the suspension Plaintiff received. Indeed, several of the proposed comparators appear to have received *less* favorable treatment than Plaintiff. At least two of the proposed comparators were demoted, another was "suspended then reinstated with minimal punishment[,]" another was "suspended pending termination" and ultimately punished with "a loss

---

[6] Plaintiff alleges in Paragraph 66 of the Complaint that "the charges that were brought against Plaintiff were disproportionate in comparison to . . . the charges that her colleagues and superiors of different races and sex had brought against them for more egregious offenses." It is not clear whether "her colleagues and superiors of different races and sex" refers to the eight purported comparators listed in Paragraph 59.

of 15 days of leave[.]" (Compl. ¶ 59). One proposed comparator, who was charged with "use of force," "received no suspension" but "received a severe letter of reprimand and a loss of 5 days of leave." (*Id.*)

In sum, the facts alleged in the Complaint regarding the proposed comparators are insufficient to provide a plausible basis for the proposition that any of the purported comparators both were actually similarly situated to Plaintiff and received more favorable treatment than Plaintiff. The facts in the Complaint are ultimately inadequate to support a reasonable inference that Defendant engaged in unlawful discrimination by taking an adverse employment action against Plaintiff based on her race, sex, or gender. Therefore, Plaintiff has failed to state a plausible claim of discrimination under Title VII. Accordingly, Defendant's motion will be granted as to Counts I and II, and these counts will be dismissed without prejudice.[7]

### B. Section 1983 Discrimination Claim: Count III

Under 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, subjects the plaintiff "to the deprivation of any rights, privileges, or immunities

---

[7] The Complaint briefly mentions that Plaintiff "continues to work in a hostile work environment" and that "she was subjected to retaliatory actions by her supervisors." (Compl. ¶¶ 61, 62). The elements of a hostile work environment claim under Title VII are "(1) unwelcome conduct; (2) that is based on the plaintiff's [protected trait]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive environment; and (4) which is imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (citation omitted). The elements of a retaliation claim under Title VII are that "(1) the plaintiff engaged in a protected activity … (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action." *Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) (citation omitted). Plaintiff alleges that she "continues to work in a hostile work environment where she fears discrimination based on sex, race, and retaliation" and that "during her suspension, she was further subjected to retaliatory actions by her supervisors, which based on reason and belief is related to her complaining about Sgt. Koushall." (Compl. ¶¶ 61, 62). Apart from these general and conclusory statements, Plaintiff does not plead any specific facts to state a plausible claim for either hostile work environment or retaliation under Title VII. Moreover, there are no separate counts identified in the Complaint as Title VII claims for hostile work environment or retaliation. Therefore, to the extent that Plaintiff attempts to state either a hostile work environment claim or retaliation claim under Title VII, this effort falls short of the plausibility standard of *Iqbal*, 556 U.S. at 663, and *Twombly*, 550 U.S. at 570.

secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377, 383 (2012). Section 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see also Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the federal Constitution or laws was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019).

In Count III of the Complaint, Plaintiff alleges that she "has been treated differently and subjected to different terms and conditions of her employment due to her race." (Compl. ¶ 111). While Plaintiff does not specifically allege that the right implicated in her § 1983 claim arises under 42 U.S.C. § 1981, she argues that she "has sufficiently plead [*sic*] a claim under *Monell* and Sections 1981 through 1983." (Pl. Opp'n at 8). Thus, the Court treats Count III as a § 1983 claim based upon an alleged violation of § 1981, which, among other things, "prohibits discrimination in employment on the basis of race." *Yashenko v. Harrah's N.C. Casino Co., LLC*, 446 F.3d 541, 551–52 (4th Cir. 2006); *see also*, *Jett v. Dallas Independent School District*, 491 U.S. 701, 735 (1989) ("We hold that the express 'action at law' provided by § 1983 for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, provides for the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.").

A § 1983 suit by an individual against a state for money damages is barred by state sovereign immunity, embodied in the Eleventh Amendment. *See Quern v. Jordan*, 440 U.S. 332, 345, 99 (1979). Although BPD is a state entity for purposes of Maryland law, it is a municipal

entity for purposes of § 1983 and may be subject to suit under § 1983.[8] *See, e.g., Earl v. Taylor*, CCB-20-1355, 2021 WL 4458930, at *3 (D. Md. Sept. 29, 2021); *Lucero v. Early*, GLR-13-1036, 2019 WL 4673448, at *4 (D. Md. Sept. 25, 2019); *Bumgardner v. Taylor*, RBD-18-1438, 2019 WL 1411059, at *5 (D. Md. Mar. 28, 2019); *Fish v. Mayor and City of Balt.*, CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018); *Chin v. City of Balt.*, 241 F. Supp. 2d 546, 548 (D. Md. 2003); *Alderman v. Balt. Police Dep't*, 952 F. Supp. 256, 258 (D. Md. 1997). This is because BPD is "sufficiently concerned with local matters, independently funded, interconnected with local government, and autonomous from state government. . . ." *Earl*, 2021 WL 4458930, at *3. However, "municipal liability [under § 1983] cannot be premised on respondeat superior or vicarious liability." *Buffington v. Baltimore County*, 913 F.2d 113, 133 (4th Cir. 1990); *see also Monell*, 436 U.S. at 693-94. A municipal entity may be liable under § 1983 based on the unconstitutional actions of individuals, but only where those individuals were executing an "official municipal policy" that resulted in a deprivation of the plaintiff's rights. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). These claims are commonly referred to as *Monell* claims and consist of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's federal rights. *See id.* at 694; *see also Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004).

A plaintiff may demonstrate the existence of an official policy for purposes of a *Monell* claim through: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) certain omissions made by policymaking officials that "manifest

---

[8] BPD is considered a "person" subject to suit under § 1983. *See*, *e.g.*, *Fish v. Mayor and City of Balt.*, Civ. No. CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018).

deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).

Beyond "formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see also Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003). A custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987); *see Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016).

In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (internal citations omitted). But a policy or custom that gives rise to § 1983 liability cannot "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Id.* at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). "To prove deliberate indifference, a plaintiff must show 'that the [defendant] subjectively recognized a substantial risk of harm and that his actions were inappropriate in light of the risk.'" *Washington v. Hous. Auth. of City of Columbia*, 58 F.4th

170, 179 (4th Cir. 2023) (quoting *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 416 (4th Cir. 2020)).

Here, the Complaint does not allege that Plaintiff's federal rights were deprived through any official policy of BPD but does refer to a "pervasive culture and custom within BPD of treating African American officers differently than white officers when it came to promotions, disciplinary actions, and conduct." (Compl. ¶ 114). The Complaint briefly notes a 2016 report by the U.S. Department of Justice ("DOJ") regarding "[BPD's] widespread constitutional violations, the targeting of African Americans, and a culture of retaliation." (Compl. ¶ 1). However, the Complaint does not contain sufficient facts to place the mistreatment Plaintiff claims she has suffered at BPD in the context of findings made in DOJ's report. The Complaint states in conclusory fashion that "Plaintiff's allegations clearly show a custom of discrimination as required by Section 1983," (Compl. ¶ 115), but offers no facts depicting any such custom. The only individual alleged in the Complaint to have suffered the sort of discriminatory treatment Plaintiff claims she suffered is Plaintiff, and those allegations are inadequate to state a plausible claim of race discrimination or to support a plausible claim that any discriminatory custom at BPD resulted in a deprivation of Plaintiff's federal rights. In sum, the Complaint falls short of stating a plausible *Monell* claim of race discrimination under § 1983. Defendant's motion will be granted with respect to Count III, and Plaintiff's § 1983 claim will be dismissed without prejudice.

### C. MFEPA Claim: Count IV

MFEPA prohibits discrimination in employment on the basis of race, sex, and other protected classifications. Md. Code Ann., State Gov't, § 20-606(a). This Maryland statute is a state law analogue to federal employment discrimination statutes. *See Lowman v. Maryland Aviation Admin*., Civ. No. JKB-18-1146, 2019 WL 133267, at *4 (D. Md. Jan. 8, 2019) (FEPA "'is the state

analogue of Title VII'"). Courts apply Title VII case law to MFEPA claims. *See Haas v. Lockheed Martin Corp.*, 396 Md. 469 (2007); *Linton v. Johns Hopkins Applied Physics Lab*, LLC, Civ. No. JKB-10-276, 2011 WL 4549177 at *5, n.3 (D. Md. Sept. 28, 2011).

A plaintiff may state a claim for harassment or hostile work environment by alleging that "the offending conduct (1) was unwelcome, (2) was based on her [race or] sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 412 (D. Md. 2015) (quoting *Ocheltree v. Scollon Prods., Inc.,* 335 F.3d 325, 331 (4th Cir. 2003). The "severe or pervasive" requirement has both subjective and objective components. *See Harris v. Forklift Sys.*, *Inc*., 510 U.S. 17, 21–22 (1993); *Perkins v. Int'l Paper Co*., 936 F.3d 196, 207–08 (4th Cir. 2019). "[W]hen determining whether the harassing conduct was objectively severe or pervasive," a court considers "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 208 (quoting *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008)). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Likewise, the "[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment[.]" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 21). And "complaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under. . . ." *Sunbelt Rentals*, 521

F.3d at 315–16 (internal quotation marks and citations omitted).

In Count IV of the Complaint, Plaintiff alleges that she "was subjected to harassment or offensive conduct" based on her race and sex. (Compl. ¶ 123). She further alleges that the "ongoing harassment" she suffered included "highly inappropriate and offensive sexual comments[,]" being "prejudicially treated as a suspect on the night [of the night club incident] even after she properly identified herself as law enforcement[,]" having "false allegations" made against her by IA investigators "that ultimately resulted in charges despite Plaintiff's consistent efforts to assist [the] investigators in every capacity[,]" and having "charges . . . brought against Plaintiff [that] were disproportionate in comparison to her actual involvement in the incident[.]" (*Id.*)

Plaintiff's allegations are inadequate to state a plausible claim of harassment under MFEPA. The Complaint offers no information regarding the content, context, frequency, or impact of the "highly inappropriate and offensive sexual comments" Plaintiff alleges she endured. Without these facts, one can only speculate whether these comments were "sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment[.]" *Ocheltree,* 335 F.3d at 331. Plaintiff also fails to allege that the "false allegations" she claims IA investigators made against her were sufficiently severe or pervasive to support a claim of harassment under MFEPA. Plaintiff's remaining allegations regarding harassment were singular events that, in the circumstances described in the Complaint, do not rise to the level of creating an abusive work environment. Count IV fails to state a plausible claim of discriminatory harassment under MFEPA. Moreover, as explained in Part III.A.2 *supra*, Plaintiff fails to allege sufficient facts to support an inference that any conduct she endured at BPD was on account of her race or sex.

Therefore, Defendant's motion will be granted as to Count IV, and Plaintiff's MFEPA claim will be dismissed without prejudice.[9]

## IV.    **Conclusion**

In summary, the Complaint does not include sufficient factual allegations to support any claim of discrimination under Title VII, 42 U.S.C. § 1983, or MFEPA. Therefore, Defendant's Motion to Dismiss will be granted and the Complaint will be dismissed without prejudice.

A separate Order follows.


  September 29, 2023                                  /S/                    
Date                                                                 Matthew J. Maddox
                                                                     United States Magistrate Judge

---

[9] Defendant argues that (1) Plaintiff "failed to provide the required notice under the [Local Government Tort Claims Act ("LGTCA")], and (2) as a state agency, BPD is entitled to sovereign immunity from suit under MFEPA. (Def. Mem. at 15–17). Because the Court dismisses Plaintiff's MFEPA claim based on the insufficiency of the pleading, the Court need not address the issues Defendant raises regarding LGTCA notice and sovereign immunity.